# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **NANCY SMITH,**<br>     **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **NO. 17-7267** |
| **BOARD OF COMMISSIONERS OF THE**<br>**LOUISIANA STADIUM AND EXPOSITION**<br>**DISTRICT, ET AL.,**<br>     **Defendants** | **SECTION:**<br><br>**"E" (2)** |

## <u>ORDER AND REASONS</u>

Before the Court is a motion for summary judgment, filed by Defendants the Louisiana Stadium and Exposition District ("LSED"), Kyle France, in his official capacity as Chairman of the Board of Commissioners of the LSED, and SMG.[1] The motion is opposed.[2] In this order, the Court addresses Defendants' argument that the LSED is entitled to sovereign immunity on Plaintiff Nancy Smith's claim for damages against it under Title II of the Americans with Disabilities Act ("ADA"). For the reasons that follow, the Court **GRANTS** Defendants' motion for summary judgment, finding the LSED is entitled to sovereign immunity on Plaintiff's Title II damages claim. The Court also finds *sua sponte* that the LSED is entitled to sovereign immunity on Plaintiff's Title II claim for injunctive relief against it and that France, sued in his official capacity, is entitled to sovereign immunity on Plaintiff's Title II damages claim against him. The Court will address the remaining issues raised by the motion by separate order.[3]

---

[1] R. Doc. 45. In her Amended Complaint, Plaintiff named the Board of Commissioners of the LSED as a defendant based on her belief that the Board owned the Mercedes-Benz Superdome. R. Doc. 5. The Court granted her motion to substitute the LSED as a defendant in place of the Board of Commissioners of the LSED. R. Doc. 82. The motion for summary judgment was filed on behalf of the LSED and France.

[2] R. Doc. 59.

[3] The Court already has addressed Defendants' arguments regarding Plaintiff's standing to seek injunctive relief. R. Doc. 87.

## FACTUAL AND PROCEDURAL BACKGROUND

The following facts are undisputed. Plaintiff is an amputee who is disabled within the meaning of the ADA.[4] On April 2, 2016, she attempted to call the box office of the Mercedes-Benz Superdome ("Superdome") to purchase tickets for a Guns N' Roses concert, to be held on July 31, 2016.[5] In reality, she contacted a representative of Box Office Ticket Center LLC, who assured her the tickets she was purchasing were accessible seats compliant with the ADA.[6]

The Superdome is owned by the LSED and operated and managed by Defendant SMG. SMG is responsible for coordinating events, including creating seating charts for concerts.[7] Ticketmaster LLC, not Box Office Ticket Center LLC, has the sole and exclusive right to sell and distribute tickets for concerts at the Superdome.[8] SMG identifies accessible seats in its seating chart for music concerts and submits that information to Ticketmaster LLC.[9] SMG's usual practice is to reserve additional ADA-accessible seats in case a customer with a disability, but without a ticket for an accessible seat, requests to be moved to an accessible seat.[10] For the Guns N' Roses concert, SMG reserved approximately one hundred fifty-one accessible seats for this purpose.[11]

Plaintiff's tickets originally were bought from Ticketmaster LLC and resold on the secondary market by Box Office Ticket Center LLC.[12] The seat for which Plaintiff purchased a ticket had not been designated by SMG as accessible.[13] When Plaintiff and

---

[4] R. Doc. 69 at 9, ¶ 7(a) (uncontested material facts in pretrial order).
[5] *Id.* at 10, ¶¶ 7(f)–(g).
[6] *Id.* at ¶¶ 7(g)–(h).
[7] *Id.* at ¶¶ 7(c)–(e).
[8] *Id.* at 11, ¶ 7(k).
[9] *Id.* at ¶ 7(m).
[10] R. Doc. 45-2 at 4, ¶ 19; R. Doc. 59-1 at 5, ¶ 19.
[11] R. Doc. 45-2 at 4, ¶ 24; R. Doc. 59-1 at 6, ¶ 24.
[12] R. Doc. 69 at 10–11, ¶¶ 10(h), (k).
[13] *Id.* at 10, ¶ 7(i).

her daughter arrived at the Superdome on the night of the concert, they sought assistance from a SMG staffer to locate their seats.[14] Plaintiff asked the staffer to remove the existing chair in the space of her ticketed seat to permit her to park her wheelchair in its place.[15] The staffer told her the existing chair could not be removed.[16] Plaintiff expressed safety concerns about being transferred out of her wheelchair, but eventually agreed to do so.[17] The SMG staffer took her wheelchair, which was returned to her after the concert.[18]

On July 28, 2017, Plaintiff filed a complaint.[19] She filed an amended complaint on August 20, 2017.[20] The Defendants remaining in the case are the LSED, France, in his official capacity as Chairman of the Board of Commissioners of the LSED, and SMG. Plaintiff brings (1) a claim for damages and injunctive relief under Title II of the ADA against the LSED and France, (2) a claim for damages under the LHRA against SMG, and (3) a claim for injunctive relief under Title III of the ADA against SMG.[21]

On December 26, 2018, Defendants SMG, the LSED, and France filed the instant motion.[22] Plaintiff opposes.[23] In this order, the Court addresses Defendants' argument that the LSED is entitled to sovereign immunity on Plaintiff's claim for damages under Title II of the ADA. The Court also addresses *sua sponte* whether the LSED is entitled to sovereign immunity on Plaintiff's Title II claim for injunctive relief against it and whether France, sued in his official capacity, is entitled to sovereign immunity on Plaintiff's Title II damages claim against him.

---

[14] *Id.* at 12, ¶ 7(t).
[15] *Id.* at ¶ 7(u).
[16] *Id.*
[17] *Id.* at ¶ 7(v).
[18] *Id.* at ¶¶ 7(w)–(x).
[19] R. Doc. 1.
[20] R. Doc. 5.
[21] R. Doc. 70 at 1–2.
[22] R. Doc. 45.
[23] R. Doc. 59.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[24] "An issue is material if its resolution could affect the outcome of the action."[25] When assessing whether a material factual dispute exists, the Court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."[26] All reasonable inferences are drawn in favor of the non-moving party.[27] There is no genuine issue of material fact if, even viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party, thus entitling the moving party to judgment as a matter of law.[28]

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." To satisfy Rule 56's burden of production, the moving party must do one of two things: "the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim" or "the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." If the moving party fails to carry this burden, the motion must be denied. If the moving party successfully carries this burden, the burden of production then shifts to the non-moving party to direct the Court's attention to something in the

---

[24] Fed. R. Civ. P. 56; *see also Celotex v. Catrett*, 477 U.S. 317, 322–23 (1986).

[25] *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005).

[26] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000).

[27] *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[28] *Hibernia Nat. Bank v. Carner*, 997 F.2d 94, 98 (5th Cir. 1993) (citing *Amoco Prod. Co. v. Horwell Energy, Inc.*, 969 F.2d 146, 147–48 (5th Cir. 1992)).

pleadings or other evidence in the record setting forth specific facts sufficient to establish that a genuine issue of material fact does indeed exist.[29]

If the dispositive issue is one on which the non-moving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the non-movant's claim, or (2) affirmatively demonstrating that there is no evidence in the record to establish an essential element of the non-movant's claim.[30] If the movant fails to affirmatively show the absence of evidence in the record, its motion for summary judgment must be denied.[31] Thus, the non-moving party may defeat a motion for summary judgment by "calling the Court's attention to supporting evidence already in the record that was overlooked or ignored by the moving party."[32] "[U]nsubstantiated assertions are not competent summary judgment evidence. The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. 'Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment.'"[33]

---

[29] *Celotex*, 477 U.S. at 322–24.
[30] *Id.* at 331–32 (Brennan, J., dissenting).
[31] *See id.* at 332.
[32] *Id.* at 332–33. The burden would then shift back to the movant to demonstrate the inadequacy of the evidence relied upon by the non-movant. Once attacked, "the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Id.* at 332–33, 333 n.3.
[33] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (citing *Celotex*, 477 U.S. at 324; *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) and quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16, 919 n.7 (5th Cir. 1992)).

## LAW AND ANALYSIS

Defendants argue there are no disputed material facts, and as a matter of law, the LSED is entitled to sovereign immunity because the LSED is an arm of the State of Louisiana, and Congress did not validly abrogate sovereign immunity under Title II of the ADA for Plaintiff's damages claim.[34] Plaintiff argues the LSED is not entitled to sovereign immunity because the LSED is a local political subdivision of the state, and that, even if it would otherwise be entitled to sovereign immunity, Title II of the ADA validly abrogates sovereign immunity for Plaintiff's claim.[35]

## I.     The LSED is an arm of the state entitled to sovereign immunity.

Although the Louisiana Constitution waives the sovereign immunity of the State of Louisiana in tort suits,[36] this waiver of sovereign immunity is expressly limited to suits in *state* court.[37] "[A] state can create a limited waiver of [sovereign] immunity by consenting to be sued in its own state courts without waiving its Eleventh Amendment immunity from suit in federal courts.  In other words, a state may waive its common law sovereign immunity under state law, without waiving its Eleventh Amendment immunity under federal law."[38] Because this suit was filed in federal court, the Court must address whether the LSED is entitled to Eleventh Amendment sovereign immunity.

---

[34] R. Doc. 45-1 at 17–27.
[35] R. Doc. 59 at 18–28.
[36] LA. CONST., art. XII, § 10(A).
[37] LA. REV. STAT. § 13:5106(A) ("No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court.").
[38] *In re Allied-Signal, Inc.*, 919 F.2d 277, 281 (5th Cir. 1990) (citing *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299 (1990)).

In *Hudson v. City of New Orleans*, the Fifth Circuit laid out six factors used to determine whether a state entity is entitled to Eleventh Amendment sovereign immunity.[39] The court explained:

> To help identify when a suit against a governmental entity, or an official of the entity sued in his official capacity, is considered to be a suit against the state, we have in the past utilized six factors:
>
> 1. Whether the state statutes and case law view the agency as an arm of the state;
> 2. The source of the entity's funding;
> 3. The entity's degree of local autonomy;
> 4. Whether the entity is concerned primarily with local as opposed to statewide problems;
> 5. Whether the entity has the authority to sue and be sued in its own name; and
> 6. Whether the entity has the right to hold and use property.
>
> A defendant need not possess each of the above attributes to benefit from the Eleventh Amendment.[40]

The second factor is the most important because "an important goal of the Eleventh Amendment is the protection of state treasuries."[41] Courts "typically deal with the last two factors in a fairly brief fashion."[42]

A. <u>Under state statutes and case law, the LSED is an arm of the state.</u>

Plaintiff's primary argument with regard to the first *Hudson* factor is that the LSED is a political subdivision of Louisiana.[43] Generally, "the states and their political subdivisions are protected by the sovereign immunity principle embodied in the Eleventh Amendment."[44] However, "[n]ot all political subdivisions are automatically immunized

---

[39] 174 F.3d 677, 681–82 (5th Cir. 1999) (citing *Clark v. Tarrant County*, 798 F.2d 736, 744–45 (5th Cir. 1986)).
[40] *Id.*
[41] *Delahoussaye v. City of New Iberia,* 937 F.2d 144, 147–48 (5th Cir.1991); *see also id.* at 682.
[42] *Hudson*, 174 F.3d at 682 (citing *Pendergrass v. Greater New Orleans Expressway Comm'n*, 144 F.3d 342, 347 (5th Cir. 1998); *Delahoussaye,* 937 F.2d at 147).
[43] R. Doc. 59 at 20.
[44] *Evans v. City of Bishop*, 238 F.3d 586, 589 (5th Cir. 2000).

when the state is immunized."[45] Rather, courts "look to see whether the entity in effect stands in the shoes of the state itself."[46]

In *Vogt v. Bd. of Comm'rs of Orleans Levee Dist.*, the Fifth Circuit stated the statutory classification of an entity as "political subdivision" is "significant" in the analysis of the first *Hudson* factor and that "virtually every . . . government entity classified as a political subdivision has been denied Eleventh Amendment immunity."[47] However, this is not a "hard-and-fast rule."[48] Rather, political subdivisions are generally held not to be arms of the state because they are "more local in character" and "are not part of any department within the executive branch of government."[49]

In this case, the provision of the Louisiana Constitution of 1921 creating the LSED specified the LSED is a political subdivision.[50] This provision remains in effect.[51] Louisiana caselaw on this issue also holds that the LSED is a political subdivision.[52] Plaintiff cites several cases standing for this proposition.[53] However, the fact that the LSED is described as a political subdivision is not determinative. The Court must determine whether the LSED functions as an arm of the state. Under Louisiana law,

---

[45] *Id.* (citing *Earles v. State Bd. of Certified Pub. Accountants,* 139 F.3d 1033, 1036 (5th Cir.1998)).

[46] *Id.* (quoting *Earles*, 139 F.3d at 1036).

[47] 294 F.3d 684, 692 (5th Cir. 2002).

[48] *Id.*

[49] *Id.*

[50] LA. CONST. of 1921, art. XIV, § 47(A) (1966).

[51] LA. CONST. art. XIV, § 16(A)(10).

[52] *See Arata v. Louisiana Stadium & Exposition Dist.*, 254 La. 579, 599–600 (1969) ("As a separate corporate body and political subdivision of the State, the District is without any authority to bind or obligate the State in any manner."). A dissenting opinion in *Arata* states that the LSED is "a hybrid sort of thing," but also that it "is nothing but an agency of the State." *Id.* at 616 (McCaleb, J., dissenting).

[53] R. Doc. 59 at 25–26 (collecting cases). A Louisiana Attorney General opinion, cited by Defendants, R. Doc. 45-1 at 18, states that, because of Act 541 and the Executive Reorganization Act, "LSED is no longer a political subdivision of the State." La. Att'y Gen., Opinion Letter No. 91-300 (July 30, 1991), 1991 WL 575248. However, this is in direct conflict with two opinions issued by the same office. La. Att'y Gen. Op. No. 91-186 (June 25, 1991), 1991 WL 575147 ("[The LSED is] a political subdivision of the State of Louisiana composed of the Parishes of Orleans and Jefferson."); La. Att'y Gen., Opinion Letter No. 83-741 (Sept. 6, 1983) 1983 WL 177139 ("The Louisiana Stadium and Exposition District itself originally was and continues to be a political subdivision of the State of Louisiana.").

determining whether an entity is an arm of the state "requires a fact intensive inquiry, investigating the entity's powers and functions, as well as its interrelationship with the state."[54]

      i.     *The history of the LSED weighs in favor of finding it is an arm of the state.*

A brief overview of the history of the LSED is instructive in determining the LSED's status under state law. The LSED was created in 1966 by amendment to the Louisiana Constitution of 1921.[55] The constitutional provision creating the LSED, codified at Article XIV, § 47 of the Louisiana Constitution of 1921, and continued as a statutory provision under the Louisiana Constitution of 1974,[56] specifies that the LSED is a "body politic and corporate and political subdivision of the State of Louisiana composed of all of the territory in the Parishes of Orleans and Jefferson."[57] Under the constitutional provision as enacted, the LSED was to be governed by a Board of Commissioners composed of six *ex officio* members and five members appointed by local and state officials.[58]

The Louisiana Constitution of 1974 mandated the reorganization of the state government into not more than twenty departments.[59] In 1976, the legislature passed Act 541 of the 1976 Regular Legislative Session ("Act 541"), restructuring the Board of Commissioners of the LSED.[60] Act 541 provided all members of the Board were to be

---

[54] *Slowinski v. England Econ. & Indus. Dev. Dist.*, 828 So. 2d 520, 523 (La. 2002) (citing *Polk v. Edwards,* 626 So. 2d 1128 (La. 1993)).

[55] LA. CONST. of 1921, art. XIV, § 47 (1966); *see also Watermeier v. Louisiana Stadium & Exposition Dist.*, 308 F. Supp. 273, 274 (E.D. La. 1969) (outlining history of creation of LSED).

[56] LA. CONST. art. XIV, § 16(A)(10).

[57] LA. CONST. of 1921, art. XIV, § 47(A) (1966).

[58] LA. CONST. of 1921, art. XIV, § 47(B) (1966), *repealed by* Act 541 of the 1976 Regular Legislative Session, § 15, 1976 La. Acts 1426, 1433 (1976).

[59] LA. CONST. art. XIV, § 6 ("The legislature shall allocate, within not more than twenty departments, the functions, powers, duties, and responsibilities of all departments, offices, agencies, and other instrumentalities within the executive branch, except those allocated by this constitution [of 1974].").

[60] 1976 La. Acts 1426.

appointed by the Governor from each of the public service districts in the state.[61] Section 10 of Act 541 provides, "[i]t is the intent of this Act that the state of Louisiana, through the Governor, hereby takes over and assumes full responsibility for the management of the properties" of LSED.[62] In the Executive Reorganization Act, passed in 1977,[63] the legislature cited Act 541 and transferred to the Office of the Governor the "powers, duties, functions, and responsibilities" of "Louisiana Stadium and Exposition District, Board of Commissioners."[64] This transfer of the LSED to the Office of the Governor weighs in favor of finding the LSED is an arm of the state.

    ii.    *Inclusion of the LSED in the section of the Louisiana Revised Statutes organizing the Executive Branch weighs in favor of finding the LSED is an arm of the state.*

In *Slowinski v. England Econ. & Indus. Dev. Dist.*, the Louisiana Supreme Court laid out several factors Louisiana courts consider when determining whether, for purposes of state law, an entity is an instrumentality of the state or more comparable to a parish or municipal government."[65] The first factor the Louisiana Supreme Court considered was whether the entity's enabling legislation is in the title of the Louisiana Revised Statutes on "Municipalities and Parishes," Title 33, or in the title on "Organization of Executive Branch of State Government," Title 36.[66] In this case, the amendment creating the LSED was included in Article XIV of the Louisiana Constitution of 1921, which governed "Parochial and Municipal Affairs."[67] However, with the passage of the Executive Reorganization Act of 1977, the legislature included the Board of

---

[61] § 2(A), 1976 La. Acts at 1427.
[62] § 10, 1976 La. Acts at 1433.
[63] Executive Reorganization Act, Act No. 83, § 4(B)(1)(u), 1977 La. Acts 255, 262 (1977).
[64] LA. REV. STAT. 36:4(B)(1)(u) (citing 1976 La. Acts 1426).
[65] 2002-0189 (La. 10/15/02), 828 So. 2d 520, 524.
[66] *Id.*
[67] LA. CONST. of 1921, art. XIV.

Commissioners of the LSED in a list of agencies under the Executive Office of the Governor in Title 36 of Louisiana Revised Statutes.[68] The legislature's placement of the LSED in the portion of the Revised Statutes entitled "Organization of Executive Branch of State Government," Title 36, weighs in favor of finding the LSED to be an arm of the state under Louisiana law.

iii.     *The language of LSED's enabling legislation weighs in favor of finding the LSED is an arm of the state.*

In *Slowinski*, the Louisiana Supreme Court found the England Economic and Industrial Development District ("EEIDD") not to be an arm of the state and noted the EEIDD's enabling legislation did not refer to it as an "instrumentality of the state."[69] The Louisiana Supreme Court said, "the legislature possesses the power to designate a political subdivision to be an instrumentality of the state. . . . Because of the weighty consequences that arise when the legislature includes the term of art, 'instrumentality of the state,' . . . it is unreasonable to assume our legislature overlooked it."[70]

The provision in the 1921 Constitution creating the LSED unequivocally states the LSED "constitute[s] an instrumentality of the State of Louisiana.[71] In fact, in *Slowinski*, the Louisiana Supreme Court quoted this provision and cited the LSED an example of an entity that the legislature has explicitly declared to be an instrumentality of the state.[72]

The provision of the 1921 Constitution creating the LSED also states the LSED "exercise[es] public and essential governmental functions," that its powers are "deemed and held to be essential governmental functions of the State," and that its exercise of its

---

[68] La. Rev. Stat. 36:4(B)(1)(u) (citing 1976 La. Acts 1426).
[69] 828 So.2d at 528.
[70] *Id.* at 527–28.
[71] La. Const. of 1921, art. XIV, § 47(C) (1966), *continued as a statute as provided by* La. Const. art. XIV, § 16(A)(10).
[72] *Slowinski*, 828 So. 2d at 527.

powers "will be in all respects for the benefit of the people of the State."[73] Under *Slowinski*, such language "could be construed to imply a legislative intent" that the LSED is an instrumentality of the state when the statute also explicitly designates the entity to be a state instrumentality.[74] The language of the LSED's enabling legislation weighs in favor of finding it is an arm of the state.

    iv.    *The LSED's jurisdiction weighs in favor of finding it is an arm of the state.*

In *Polk v. Edwards*, the Louisiana Supreme Court determined the Louisiana Economic Development and Gaming Corporation ("Casino Corporation") is an instrumentality of the state.[75] In support of its conclusion, the *Polk* court cited the Casino Corporation's enabling statute, under which the corporation is "accountable to the governor, the legislature, and the people of the state through a system of audits, reports, and legislative oversight, and through financial disclosure."[76] The Louisiana Supreme Court also noted the Casino Corporation's board of directors is "appointed by the governor and confirmed by the Senate," and select a president with the approval of the Governor.[77]

In contrast, in *Slowinski*, the Louisiana Supreme Court found the EEIDD was limited in "jurisdiction and scope" to Rapides Parish.[78] EEIDD is "composed of all of the territory located within Rapides Parish."[79] All members of the Board of Commissioners of the EEIDD are required to be domiciliaries of the Parish and are appointed by local

---

[73] La. Const. of 1921, art. XIV, § 47(C) (1966), *continued as a statute as provided by* La. Const. art. XIV, § 16(A)(10).

[74] *Slowinski*, 828 So. 2d at 527–28.

[75] 626 So. 2d 1128, 1146 (La. 1993).

[76] *Id.* (citing La. Rev. Stat. § 4:602(A) (1993), *subsequently recodified at* La. Rev. Stat. § 27:202(A)).

[77] *Id.* (citing La. Rev. Stat. § 4:611(A)(1) (1993), *subsequently recodified at* La. Rev. Stat. § 27:211(A)(1)).

[78] *Id.* at 524.

[79] *Id.* (quoting La. Rev. Stat. § 33:130.351).

elected officials.[80] The Board fills its own vacancies and elects its own officers.[81] The EEIDD has

> the authority to adopt its own bylaws and other rules and regulations; to enter into contracts; to incur debt and issue general obligation bonds in its own name and behalf; to acquire property by gift, grant, purchase, lease, expropriation or otherwise; to sell, transfer, and convey any property acquired by it; and to levy and collect ad valorem, sales, and use taxes.[82]

The Board of Commissioners of the EEIDD has plenary power to govern the EEIDD.[83] The Court found these factors show the EEIDD is "entirely governed from within Rapides Parish" and is "entirely emancipated from state control and oversight."[84] The court found this weighed in favor of finding the EEIDD is not an instrumentality of the state.[85]

Like the EEIDD in *Slowinski*, which is geographically limited to Rapides Parish, the LSED is "composed of all of the territory in the Parishes of Orleans and Jefferson."[86] The domicile of the LSED is in New Orleans.[87] However, the LSED's structure and organization is more analogous to the Casino Corporation in *Polk* because the Board of Commissioners of the LSED is appointed by the Governor, the Chairman of the Board is selected by the Governor, and the LSED is subject to audit by the State Legislative Auditor. In short, the LSED is fully within state control and oversight, which weighs in favor of finding it is an arm of the state.

---

[80] *Id.* at 524 n.4 (citing LA. REV. STAT. § 33:130.353(A)).
[81] *Id.* at 525 (citing LA. REV. STAT. § 33:130.353(G)).
[82] *Id.* at 524–25 (citing LA. REV. STAT. §§ 33:130.353, 130.355).
[83] *Id.* at 525 (citing LA. REV. STAT. § 33:130.355 (18)).
[84] *Id.* at 524.
[85] *Id.*
[86] LA. CONST. of 1921, art. XIV, § 47(A) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).
[87] § 2(B), 1976 La. Acts at 1427.

v. *The structure of the Board of Commissioners of the LSED weighs in favor of finding it is an arm of the state.*

The structure of the Board of Commissioners of the LSED also leads to the same conclusion. Section 47(B) of the provision of the Louisiana Constitution of 1921 originally creating the LSED provided the Board of Commissioners of the LSED would include six *ex officio* members—"the Governor, the Speaker of the House of Representatives and the President *pro tem* of the Louisiana Senate, the Mayor of the City of New Orleans, the presiding Councilman at Large of the City Council of New Orleans and the Parish President of the Parish of Jefferson"—and five appointed members—three appointed by the Mayor of the City of New Orleans, one by the Parish President of the Parish of Jefferson and one by the Governor of Louisiana.[88] However, Act 541 repealed § 47(B).[89] All members of the Board are now appointed by the Governor and serve at his pleasure.[90] Although the board may appoint officers, the Governor selects the Chairman of the Board.[91] The State is divided into five public service districts,[92] and Act 541 requires that one member of the Board of Commissioners of the LSED be appointed "from each of the public service districts in the state."[93] The Board of Commissioners of the LSED is composed of five people from different parts of the entire state.[94] The structure of the Board weighs in favor of finding the LSED is an arm of the state.

---

[88] La. Const. of 1921, art. XIV, § 47(B) (1966).
[89] § 15, 1976 La. Acts at 1433.
[90] § 2(A), 1976 La. Acts at 1427.
[91] § 2(C), 1976 La. Acts at 1427.
[92] La. Rev. Stat. 45:1161.5(A).
[93] § 2(A), 1976 La. Acts at 1427.
[94] *Id.*

vi. *The LSED's powers weigh in favor of finding it is an arm of the state.*

Act 541 states the legislature's intent for the Governor to "take[] over and assume[] full responsibility for the management of the properties" of LSED.[95] The Act delegates to the Governor the authority to "exercise all power and authority over the management of the properties" of LSED, to "delegate the management of the properties to an executive director or to a professional management organization," and to "negotiate for the sale of and sell the properties."[96] The Act also specifies and limits the "purposes, powers, and duties" of the LSED, which are largely administrative or advisory.[97]

The LSED has some of the same powers as the EEIDD, including the authority to enter into contracts, to incur debt and issue bonds in its own name and behalf, and to acquire property by "expropriation, purchase, lease or otherwise," and to levy and collect hotel occupancy taxes.[98] However, unlike the EEIDD, these powers are ultimately exercised by the Governor through the Board of Commissioners of the LSED. As a result, the Court finds the LSED is not governed from within Orleans and Jefferson Parishes and is not emancipated from state control and oversight. Instead, the LSED is governed by the Office of the Governor and is within state control. This weighs in favor of finding the LSED is an arm of the state.

B.  <u>The sources of the LSED's funding weigh in favor of finding the LSED is an arm of the state.</u>

"The most important *Hudson* factor, the source of the entity's funding, requires a two-part inquiry:" (1) the state's liability for a judgment against the officer sued in his

---

[95] § 10, 1976 La. Acts at 1433.
[96] § 13, 1976 La. Acts at 1433.
[97] § 3, 1976 La. Acts at 1428.
[98] LA. CONST. of 1921, art. XIV, § 47(D) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).

official capacity and (2) the state's liability for the entity's general debts and obligations.[99] Defendants argue that, because a judgment in this case will be paid by the Louisiana Office of Risk Management ("ORM"), the LSED is an arm of the state. The LSED filed an affidavit by Mark Joseph, the State Risk Underwriting Supervisor of ORM, which manages insurance covering property and liability exposure of the State of Louisiana.[100] Joseph testified ORM provides insurance for damages and attorney's fee awards in actions against the LSED brought under the ADA.[101] He testified that payments for such awards will be made from the "Self-insurance Fund, which was created within the [Louisiana] Department of the Treasury."[102]

According to the affidavit Defendants filed on February 7, 2019, ORM issues a self-insurance coverage document to the LSED that expressly covers tort actions.[103] Payments for judgments against the LSED are made from the Self-Insurance Fund in the Louisiana Department of the Treasury.[104]

Under Louisiana statutory law, ORM "manage[s] all state insurance covering property and liability exposure."[105] The Self-Insurance Fund, "created in the Department of the Treasury," is described as follows:

> The fund shall consist of all premiums paid by state agencies under the state's risk management program as established by this Chapter, the investment income earned from such premiums and commissions retained in accordance with the provisions of this Title. This fund shall be used *only for the payment of losses incurred by state agencies under the self-insurance program*, premiums for insurance obtained through commercial carriers, administrative expenses associated with the management of the state's risk, law enforcement officers and firemen's survivors benefits as

---

[99] *Cozzo v. Tangipahoa Par. Council--President Gov't*, 279 F.3d 273, 282 (5th Cir. 2002).
[100] R. Doc. 72-1 at 1, ¶¶ 1, 2.
[101] *Id.* at ¶¶ 3, 4.
[102] *Id.* at ¶ 6.
[103] R. Doc. 72-1 at 1, ¶ 4–5.
[104] *Id.* at ¶ 6.
[105] LA. REV. STAT. § 39:1535(A).

provided for in R.S. 40:1665(C) and 1665.2(C), the payment of losses incurred by the Jefferson Parish Human Services Authority in accordance with R.S. 28:831(J)[1], the payment of losses incurred by the Capital Area Human Services District in accordance with R.S. 28:906[1], the payment of losses incurred by the Florida Parishes Human Services Authority in accordance with R.S. 28:856[1], the payment of losses incurred by the Metropolitan Human Services District in accordance with R.S. 28:866[1], the payment of losses incurred by the Northeast Delta Human Services Authority in accordance with R.S. 28:896[1], and the funding of the legal services, such funds to be administered by the commissioner of administration.[106]

Notably, the statute limits the purposes for which the fund may be used and enumerates specific permitted uses of the fund for entities that are not instrumentalities of the state. The LSED is not included among the entities covered even though they are not instrumentalities of the state. As a result, the only statutory provision under which the Self-Insurance Fund could insure judgments against the LSED is the provision that the fund be used "for the payment of losses incurred by state agencies under the self-insurance program."[107] The ORM treats the LSED as a state agency. This is confirmed by a July 1991 opinion from the Louisiana Attorney General stating that the LSED is "a[n] agency under the executive branch" and, as a result, is "obligated to accept the insurance coverage and premium costs" assigned by ORM.[108]

The Court finds the state pays judgments against the LSED *directly*. The Court also analyzes "whether the state will *indirectly* fund a judgment against the [defendant] because the state either is responsible for general debts and obligations or provides the lion's share of the [defendant]'s budget."[109]

---

[106] *Id.* at § 39:1533(A) (emphasis added).
[107] *Id.*
[108] La. Att'y Gen., Opinion Letter No. 91-300 (July 30, 1991), 1991 WL 575248.
[109] *Id.* (emphasis added).

The provision of the 1921 Constitution creating the LSED, continued as a statute, provides the LSED's "books and records shall be subject to audit annually by the Legislative Auditor."[110] The Court takes judicial notice of the Financial Statement Audit for the year ending on June 30, 2018, issued by the Louisiana Legislative Auditor.[111] According to the Audit, "[l]osses arising from judgments, claims, and similar contingencies are paid through the state's self-insurance fund operated by the Office of Risk Management, the agency responsible for the state's risk management program, or by the General Fund appropriation."[112] The General Fund "administers and accounts for legislative appropriations provided to fund the general administrative expenditures of the District and those expenditures, including sports franchise annual payments, not funded through other specific legislative appropriations or revenues."[113] According to the audit, for the year ending on June 30, 2018, the General Fund paid $281,954 in insurance costs.[114] The General Fund had $46,199,171 in revenues, of which $29,533,161 came from the hotel occupancy tax the LSED levies directly, and $9,437,025 from the New Orleans Sports Franchise Fund,[115] which is a legislative appropriation for LSED payments to sports franchises.[116] There is no indication on the General Fund income statement of any

---

[110] LA. CONST. of 1921, art. XIV, § 47(C) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).

[111] *See* FED. R. EVID. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *see also Tu Nguyen v. Bank of Am., N.A.*, 728 F. App'x 387, 388 (5th Cir. 2018) ("Because the proposed documents are highly indisputable public records, we take judicial notice of them.").

[112] DARYL G. PURPERA, LOUISIANA LEGISLATIVE AUDITOR, LOUISIANA STADIUM AND EXPOSITION DISTRICT, A COMPONENT UNIT OF THE STATE OF LOUISIANA, FINANCIAL STATEMENT AUDIT FOR THE YEAR ENDED JUNE 30, 2018 48 (2018) ("2018 LSED LEGISLATIVE AUDIT").

[113] *Id.* at 29–30.

[114] *Id.* at 18.

[115] *Id.* at 18. The remainder of the revenue was from slots, players' taxes, vehicle license plate royalties, interest earnings, and "miscellaneous income." *Id.*

[116] Under the statute creating the New Orleans Sports Franchise Fund revenues are "appropriated and distributed each fiscal year to the Louisiana Stadium and Exposition District for use only to fund contractual obligations of the state to any National Football League or National Basketball Association franchise located

appropriation for the general administrative expenditures of the LSED.[117] The Audit also states hotel tax revenues increased in the year ending on June 30, 2018, and the increase "reduced the District's dependency on the state's General Fund appropriations to meet the contractual obligations of the District."[118]

The Legislative Audit shows that, although a majority of the revenues for the LSED's general operating fund comes from the hotel tax it levies, the state appropriates funds for the LSED to pay some of its debts and obligations. The New Orleans Sports Franchise Fund appropriations, although intended to support LSED payments to sports franchises, are placed in the same General Fund from which insurance payments are withdrawn. The fact that an increase in hotel taxes reduces the LSED's dependency on appropriations suggests that, were hotel tax revenue to decrease, the State's appropriations would increase. As a result, the Court finds the State provides indirect funding for the LSED's general debts and obligations. The second and most important *Hudson* factor weighs in favor of finding the LSED is entitled to sovereign immunity.

C.   The LSED's lack of local autonomy weighs in favor of finding it is an arm of the state.

Defendants argue that, because all the members of the LSED are appointed by and serve at the pleasure of the Governor, this factor weighs in favor of finding the LSED is an arm of the state.[119] Under Act 541, members of the LSED are appointed by the Governor and serve at his pleasure.[120] The Act evinces a clear legislative intent for the Governor to "take[] over and assume[] full responsibility for the management of the properties" of the

---

in Orleans Parish." LA. REV. STAT. § 47:322.38(B)(2). These funds are derived from a tax on hotels in Orleans Parish. *Id.* at §§ 47:322.38(A)(1), 301(14)(a).
[117] 2018 LSED LEGISLATIVE AUDIT at 18.
[118] *Id.* at 5.
[119] R. Doc. 45-1 at 19–20.
[120] § 2(A), 1976 La. Acts at 1427.

LSED.[121] The Act also delegates to the Governor the authority to "exercise all power and authority over the management of the properties" of the LSED, to "delegate the management of the properties to an executive director or to a professional management organization," and to "negotiate for the sale of and sell the properties."[122] The Act specifies and limits the "purposes, powers, and duties" of the LSED, which are largely administrative or advisory.[123] These weigh in favor of finding the LSED has little local autonomy.

The State of Louisiana is divided into five public service districts.[124] Act 541 requires that one member of the Board of Commissioners of the LSED be appointed "from each of the public service districts in the state."[125] In *Vogt*, the Fifth Circuit found local residency requirements weighed in favor of finding the levee district had a high degree of local autonomy.[126] In contrast, the Board of Commissioners of the LSED must include citizens from around the state, weighing against finding the LSED has a high degree of local autonomy.

Plaintiff argues that, because the LSED is an autonomous entity that outsources its operations to SMG, a private entity, there is local autonomy.[127] However, under Act 541, the Governor has the authority and the discretion to delegate the management of LSED properties to an executive director or a professional management organization.[128] The Governor is also authorized to negotiate and enter into a contract with a professional

---

[121] § 10, 1976 La. Acts at 1433.
[122] §§ 4(A), 5, 13, 1976 La. Acts at 1429, 1433.
[123] § 3, 1976 La. Acts at 1428.
[124] LA. REV. STAT. 45:1161.5(A).
[125] *Id.*
[126] 294 F.3d at 695.
[127] R. Doc. 59 at 28–29.
[128] § 5, 1976 La. Acts at 1429.

management organization, subject to approval by the Board of Commissioners of the LSED and the majority approval of both houses of the state legislature.[129] Contrary to Plaintiff's argument, the LSED is not an autonomous entity that outsources its operations to SMG.

The Court finds the LSED has little local autonomy, and this factor weighs in favor of finding the LSED is an arm of the state.

D. The LSED is concerned with both local and statewide problems, and this factor does not weigh in favor of or against finding the LSED is an arm of the state.

The LSED is a district composed of all of the territory in the Parishes of Orleans and Jefferson.[130] "Limited territorial boundaries suggest that an agency is not an arm of the state."[131] The LSED is empowered to levy taxes in Orleans and Jefferson Parishes, and surplus from the taxes is to be distributed to certain designated organizations in these parishes.[132] These weigh in favor of finding the LSED is primarily concerned with local problems.

However, the 1966 amendment to the Louisiana Constitution of 1921 that created the LSED specified the "exercise of the powers granted [in the amendment] will be in all respects for the benefit of the people of the State."[133] The amendment was passed as a statewide ballot measure.[134] As a result, the Court finds this factor does not weigh in favor of or against a finding that the LSED is an arm of the State of Louisiana.

---

[129] § 7, 1976 La. Acts at 1432.
[130] LA. CONST. of 1921, art. XIV, § 47(A) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).
[131] *Vogt*, 294 F.3d at 695.
[132] LA. CONST. of 1921, art. XIV, §§ 47(M), (P) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).
[133] LA. CONST. of 1921, art. XIV, § 47(C) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10).
[134] *See* Act No. 556, 1966 La. Acts 1159, 1170 (1966).

E.    The LSED's authority to sue and be sued in its own name and its right to hold and use property weigh against finding it is an arm of the state.

The final two factors may be dealt with in a cursory fashion.[135] It is uncontested the LSED has the right to sue and be sued in its own name and that it in fact holds and uses property.[136] This weighs against finding the LSED is an arm of the state.

In summary, the Court has found the first three factors weigh in favor of finding the LSED to be an arm of the state. The fourth factor does not favor either position, and the fifth and sixth factors weigh in favor of a finding the LSED is not an arm of the state. The Fifth Circuit has held the fifth and sixth factors are the least important.[137] After considering all the factors, the Court finds the LSED is an arm of the State of Louisiana entitled to sovereign immunity under the Eleventh Amendment.

## II.   Congress did not validly abrogate the LSED's sovereign immunity for Plaintiff's claim under Title II of the ADA.

Because the LSED is entitled to sovereign immunity under the Eleventh Amendment, the Court turns to whether Congress, in passing Title II, validly abrogated Eleventh Amendment sovereign immunity for Plaintiff's claim against the LSED. Congress may abrogate state sovereign immunity if it "makes its intention to abrogate unmistakably clear in the language of the statute" and "acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment."[138] The ADA clearly states Congress's intent to abrogate state sovereign immunity.[139] In *United States v. Georgia*, the Supreme Court established a three-part test to determine whether, in a particular

---

[135] *See Hudson*, 174 F.3d at 682.
[136] R. Doc. 45-1 at 20–21; R. Doc. 59 at 30; *see also* LA. CONST. of 1921, art. XIV, § 47(D) (1966), *continued as a statute as provided by* LA. CONST. art. XIV, § 16(A)(10) ("The District shall have the power to sue and be sued in its own name and is hereby authorized and empowered to plan, acquire finance, own, construct, operate and maintain [properties].")
[137] *Hudson*, 174 F.3d at 682 ("[Courts] typically deal with the last two factors in a fairly brief fashion.").
[138] *Nev. Dep't. of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003).
[139] *See Tennessee v. Lane*, 541 U.S. 509, 518 (2004) (citing 14 U.S.C. § 12202).

case, Title II's abrogation of state sovereign immunity pursuant to Section 5 of the Fourteenth Amendment is valid.[140] To make this determination, a court must consider on a claim–by–claim basis:

(1)     which aspects of the State's alleged conduct violated Title II;
(2)     to what extent such misconduct also violated the Fourteenth Amendment; and
(3)     insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.[141]

A.     Title II Violation

The first prong of the *Georgia* test requires courts to consider "which aspects of the State's alleged conduct violated Title II."[142] "[T]his inquiry is often addressed on motion to dismiss, and thus phrased in terms of whether the plaintiff sufficiently "alleged" conduct violating Title II and the Fourteenth Amendment."[143] In *Wells v. Thaler*, the Fifth Circuit addressed the first prong of the *Georgia* test in the context of a motion for summary judgment and considered whether the plaintiff "offer[ed] sufficient evidence to create an issue of material fact on his Title II claims."[144] Because Defendants raise this argument on a motion for summary judgment, the Court will consider the record and determine whether Plaintiff has offered sufficient evidence to create a genuine issue of material fact on the elements of her Title II claim.

The Fifth Circuit has listed the elements of a Title II claim as follows:

To succeed on a claim under Title II of the ADA, a plaintiff must prove: '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such

---

[140] 546 U.S. 151, 159 (2006).
[141] *Id.*
[142] *Id.*; *see also Hale v. King*, 642 F.3d 492, 498 (5th Cir. 2011) (quoting *id.*).
[143] *Wells v. Thaler*, 460 F. App'x 303, 311 (5th Cir. 2012).
[144] *Id.*

discrimination is by reason of his disability.' To recover monetary damages, a plaintiff must prove that the discrimination was intentional.[145]

It is undisputed Plaintiff has a qualifying disability.[146] In the pretrial order, the parties agree the following are contested facts:

a.  Whether the SMG staffer who escorted Ms. Smith to her ticketed seats indicated, implied, or otherwise led Ms. Smith to believe that transferring out of her wheelchair and into her ticketed seat was necessary for Ms. Smith to view the concert.

b.  Whether the SMG staffer who took Ms. Smith's wheelchair did so in accordance with SMG's policies for patron wheelchair storage.

c.  Whether Ms. Smith's wheelchair was securely stored during the Concert.[147]

The Court finds these disputed facts are material to the elements of the Title II claim. They create a genuine dispute of fact as to whether Plaintiff was denied the benefits of a program for which the LSED is responsible[148] or she was otherwise discriminated against by the LSED. They also create a genuine dispute of fact as to whether the alleged discrimination was by reason of her disability and whether it was intentional. Because Plaintiff has established genuine issues of material fact as to the elements of her Title II claim, the Court proceeds to the second prong of the *Georgia* test.

B.  Fourteenth Amendment Violation

The second prong of the *Georgia* test requires a court to determine the extent to which the state government entity's alleged violation of Title II of the ADA also violated

---

[145] *Wells*, 460 F. App'x at 311–12 (quoting *Hale*, 642 F.3d at 499, and citing *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir.2002)).

[146] R. Doc. 69 at 9, ¶ 7(a).

[147] *Id.* at

[148] To the extent Defendants argue the LSED is not vicariously liable for SMG's alleged discrimination, R. Doc. 45-1 at 24, the Court notes regulations implementing the ADA provide Title II "applies to all services, programs, and activities provided or made available by public entities." 28 C.F.R. § 35.102(a). The guidance interpreting this section clarifies that "[a]ll governmental activities of public entities are covered, even if they are carried out by contractors." 28 C.F.R. pt. 35, app. B. As a result, even though the SMG was responsible for the operations of the Guns N' Roses concert at the Superdome, the LSED is responsible for it.

the Fourteenth Amendment.[149] Section Five of the Fourteenth Amendment provides that "Congress shall have power to enforce, by appropriate legislation, the provisions" of the Fourteenth Amendment, including the Equal Protection Clause and the Due Process Clause.[150] This permits Congress to create private remedies against the states for violations of the Fourteenth Amendment.[151] As a result, "insofar as Title II creates a private cause of action for damages against the States for conduct that *actually* violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity."[152]

The alleged Title II violations in this case relate to (1) a failure to allow Plaintiff to use the elevator, (2) a failure to provide Plaintiff accessible seating after she bought inaccessible seats through the secondary ticket market, and (3) a failure to store Plaintiff's wheelchair securely. Under the Equal Protection Clause, "[d]isabled persons are not a suspect class."[153] As a result, classifications on the basis of disability are subject to rational basis scrutiny, meaning they violate the Equal Protection Clause "if they lack a rational relationship to a legitimate governmental purpose."[154] Based on the uncontested facts in this case, Plaintiff cannot show the LSED subjected her to a classification on the basis of physical disability that lacked a rational relationship to a legitimate governmental purpose. As a result, there is no violation of the Equal Protection Clause.

The Due Process Clause guarantees certain fundamental rights, and a violation of Title II violates the Due Process Clause when it prevents people with disabilities from

---

[149] *Georgia*, 546 U.S. at 159.
[150] U.S. CONST. amend. XIV, § 5.
[151] *Georgia*, 546 U.S. at 158.
[152] *Id.* at 159.
[153] *Douglas v. Gusman*, 567 F. Supp. 2d 877, 886 (E.D. La. 2008) (citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)).
[154] *Lane*, 541 U.S. at 522.

exercising those rights.[155] For example, when physical barriers prevent people with disabilities from exercising their fundamental right of access to the courts, an ADA violation also may violate the Due Process Clause.[156] The Court is unaware of any cases, and the parties cite none, in support of the proposition that Plaintiff was unable to exercise a fundamental right protected by the Due Process Clause. As a result, the Court finds no Fourteenth Amendment violation and proceeds to the third prong of the *Georgia* analysis.

C.     <u>Implication of Fourteenth Amendment Right</u>

Courts reach the third prong of the *Georgia* test on summary judgment only in cases in which there is a genuine issue of material fact as to whether a defendant's conduct violated Title II of the ADA, but the alleged conduct did not violate the Fourteenth Amendment.[157] As a result, in this case, the Court must consider whether, as to the alleged conduct, Title II of the ADA was a valid exercise of Congressional authority under Section Five of the Fourteenth Amendment.[158] In *City of Boerne v. Flores*, the Supreme Court held that, in order for Congress to exercise its enforcement power under Section Five, "[t]here must be a congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end."[159] Even if Congress proscribes conduct that does not directly violate the Fourteenth Amendment, legislation is a valid exercise of Congressional power under Section Five if this "congruence and proportionality" test is

---

[155] *Id.* at 515.
[156] *See generally id.*
[157] *Georgia*, 546 U.S. at 159.
[158] *See id.*
[159] 521 U.S. 507, 520 (1997).

satisfied.[160] If Title II is congruent and proportional to the constitutional right a claim implicates, the ADA validly abrogates sovereign immunity for the claim.[161]

In *Tennessee v. Lane*, plaintiffs were a wheelchair-bound man forced to crawl up two flights of stairs to reach a court hearing on the second floor of a courthouse and a wheelchair-bound certified court reporter who alleged she had lost work because of her inability to access courthouses.[162] In addressing whether Congress validly abrogated state sovereign immunity, the Supreme Court outlined the purpose of Title II of the ADA. The Court noted that the purpose of Title II is not limited to prohibiting state governments from violating of the Equal Protection Clause of the Fourteenth Amendment by classifying people based on disability without a rational relationship to a legitimate governmental purpose.[163] Title II also "seeks to enforce a variety of other basic constitutional guarantees, infringements of which are subject to more searching judicial review . . . includ[ing] some, like the right of access to the courts at issue in [*Lane*], that are protected by the Due Process Clause of the Fourteenth Amendment." [164]

The Court explained that "Congress enacted Title II against a backdrop of pervasive unequal treatment in the administration of state services and programs, including systematic deprivations of fundamental rights." The Court listed a plethora of examples, including

> [prohibitions on] engaging in activities such as marrying and serving as jurors[;] . . . unconstitutional treatment of disabled persons by state agencies in a variety of settings, including unjustified commitment; the abuse and neglect of persons committed to state mental health

---

[160] *Id.*

[161] *Id.*; *see also Shaikh v. Texas A&M Univ. Coll. of Med.*, 739 F. App'x 215, 225 (5th Cir. 2018) (finding erroneous a district court's holding that "state sovereign immunity bars everything but constitutional claims").

[162] 541 U.S. at 513.

[163] *Id.* at 522.

[164] *Id.* at 522–23 (citations omitted).

hospitals; irrational discrimination in zoning decisions[; and] . . . a pattern of unequal treatment in the administration of a wide range of public services, programs, and activities, including the penal system, public education, and voting. [165]

The Court found "Title II unquestionably is valid § 5 legislation as it applies to the class of cases implicating the accessibility of judicial services."[166] Finding Title II's requirement of program accessibility "congruent and proportional to its object of enforcing the right of access to the courts," the Court held Title II validly abrogated sovereign immunity as to cases involving access to the courts.[167] The Court explicitly did not address whether Title II validly abrogates sovereign immunity in "private suits for money damages for failing to provide reasonable access to hockey rinks, or even to voting booths."[168]

Plaintiff does not explicitly state the Fourteenth Amendment right she argues is implicated by Defendants' conduct. Rather, she cites *Lane* to argue the alleged Title II violation is "within the universe of rights grounded in the Fourteenth Amendment because 'the sheer volume of evidence demonstrating the nature and extent of unconstitutional discrimination against persons with disabilities in the provision of public services.'"[169] To the extent Plaintiff identifies "discrimination against persons with disabilities in the provision of public services" as the fundamental right identified by the *Lane* court, she misconstrues *Lane*'s holding. "*Lane* identified a narrow category of state action that focused the analysis on a specific individual right—the right of access to the

---

[165] *Id.* at 524–25 (citations omitted).

[166] *Id.* at 531.

[167] *Id.*

[168] *Id.* At oral argument in *Lane*, the justices asked where it would be a "constitutional violation to refuse to afford special access to a hockey rink," and the nature of any due process right implicated. Transcript of Oral Argument at 43–46, Tennessee v. Lane, 541 U.S. 509 (2004) (No. 02-1667). Counsel for the plaintiffs-respondents admitted that the Court has never articulated a general right to "freedom of access to all governmental facilities." *Id.* at 47.

[169] R. Doc. 32 at 27 (quoting *Lane*, 541 U.S. at 528–29).

courts."[170] The Court is aware of no cases, and the parties cite none, creating a fundamental right under the Due Process Clause to freedom of access to stadiums, concerts, or all governmental buildings. As a result, the Court finds the alleged Title II violations do not implicate a right guaranteed by the Fourteenth Amendment. Congress did not validly abrogate sovereign immunity for Plaintiff's claim under Title II of the ADA. The LSED is entitled to judgment as a matter of law on Plaintiff's claim for damages under Title II of the ADA.

### III. The LSED is entitled to sovereign immunity on Plaintiff's claim for equitable relief against it under Title II of the ADA.

In the instant motion, Defendants move for judgment that the LSED is entitled to sovereign immunity on Plaintiff's claim for damages under Title II of the ADA.[171] Defendants do not argue the LSED is entitled to sovereign immunity on Plaintiff's claim for injunctive relief. However, the Court may consider the issue *sua sponte* because it bears on the court's subject-matter jurisdiction.[172]

The Eleventh Amendment entitles states to sovereign immunity in "any suit in law or equity."[173] "[T]he Eleventh Amendment bars suits for both money damages and injunctive relief unless the state has waived its immunity."[174] The Court has found the LSED is entitled to sovereign immunity on Plaintiff's claim for damages under Title II of the ADA. For the same reasons, the LSED is entitled to sovereign immunity on Plaintiff's claim for injunctive relief against it under Title II of the ADA.

---

[170] *Guttman v. Khalsa*, 669 F.3d 1101, 1120 (10th Cir. 2012).
[171] R. Doc. 45-1 at 17.
[172] *See Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 333 (5th Cir. 2002) ("[W]e may consider this [sovereign immunity] issue *sua sponte* because it bears on this court's subject-matter jurisdiction.") (citing *Burge v. Parish of St. Tammany,* 187 F.3d 452, 465–66 (5th Cir.1999)).
[173] U.S. CONST. amend. XI.
[174] *Cozzo*, 279 F.3d at 280–81.

**IV.  Kyle France is entitled to sovereign immunity on Plaintiff's claim for damages, but not injunctive relief, against him.**

Plaintiff sues France in his official capacity as Chairman of the Board of Commissioners of the LSED. Although Defendants do not move for judgment that France is entitled to sovereign immunity, the Court considers the issue *sua sponte*. "[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity. . . . The only immunities that can be claimed in an official-capacity action are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."[175] Because France is sued in his official capacity as Chairman of the Board of Commissioners, the governing entity of the LSED, he has the same entitlement to sovereign immunity against claims for damages as the LSED itself. As a result, France is entitled to sovereign immunity on Plaintiff's damages claim against him under Title II of the ADA.

France is not entitled to sovereign immunity on Plaintiff's claim for injunctive relief against him under Title II of the ADA. In *Ex parte Young*,[176] the Supreme Court "created an exception to Eleventh Amendment immunity for claims for prospective relief against state officials who have been sued in their official capacities."[177] "[P]rospective injunctive or declaratory relief against a state is permitted—whatever its financial side-effects—but retrospective relief in the form of a money judgment in compensation for past wrongs—no matter how small—is barred."[178] The Fifth Circuit has stated that *Ex parte Young* "is usually quite easy to apply," and, when a damages claim and an injunctive claim

---

[175] *Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985) (emphasis in original).
[176] 209 U.S. 123 (1908).
[177] *Nelson v. Univ. of Texas at Dallas*, 535 F.3d 318, 320 (5th Cir. 2008).
[178] *Brennan v. Stewart*, 834 F.2d 1248, 1253 (5th Cir. 1988).

are brought against a state official in his official capacity, the district court should "dismiss[] the official-capacity damage claims but retain[] jurisdiction over the official-capacity equitable one[]."[179] In this case, the Court finds France is entitled to sovereign immunity on Plaintiff's Title II damages claim against him, but not on Plaintiff's Title II claim for injunctive relief against him.

**CONCLUSION**

**IT IS ORDERED** that the motion for summary judgment, filed by Defendants SMG, the Louisiana Stadium and Exposition District, and Kyle France, in his official capacity as Chairman of the Board of Commissioners of the Louisiana Stadium and Exposition District, be and hereby is **GRANTED IN PART**.[180] The Louisiana Stadium and Exposition District is entitled to sovereign immunity on Plaintiff's claims for damages and injunctive relief against it under Title II of the Americans with Disabilities Act. France is entitled to sovereign immunity on Plaintiff's claim for damages against him under Title II of the Americans with Disabilities Act, but not on Plaintiff's claim for injunctive relief against him under Title II of the Americans with Disabilities Act.

New Orleans, Louisiana, this 7th day of March, 2019.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**

---

[179] *Id.*
[180] R. Doc. 45.