## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**NANCY SMITH,**
        **Plaintiff**

                                                **CIVIL ACTION**

**VERSUS**                                      **NO. 17-7267**

**BOARD OF COMMISSIONERS OF THE**              **SECTION: "E" (1)**
**LOUISIANA STADIUM AND EXPOSITION**
**DISTRICT, ET AL.,**
        **Defendants**

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Nancy Smith brings suit against Defendant SMG and Defendant Kyle France in his official capacity as Chairman of the Board of Commissioners of the Louisiana Stadium and Exposition District ("LSED"). Plaintiff brings claims under (1) Title II of the ADA against France, in his official capacity, for injunctive relief;[1] (2) Title III of the Americans with Disabilities Act ("ADA") against SMG for injunctive relief; and (3) the Louisiana Human Rights Act ("LHRA")[2] against SMG for damages. On her claims for injunctive relief, Plaintiff seeks an injunction requiring Defendants to do the following:

(1) train SMG staff members on SMG's policy that gives priority for elevator use to patrons with disabilities over other patrons and SMG employees,

(2) adopt a written policy and train employees on the policy to require that, when a wheelchair user with a ticket for a conventional seat objects to or indicates a

---

[1] The Court has found the LSED, which previously was named as a Defendant, is entitled to sovereign immunity on Plaintiff's claims against it. R. Doc. 90. The Court found France, sued in his official capacity, is entitled to sovereign immunity on Plaintiff's damages claim against him. *Id.* Under *Ex parte Young*, France is not entitled to sovereign immunity on Plaintiff's claim against him for injunctive relief.

[2] LA. REV. STAT. § 51:2231 *et seq.* The parties also refer to this act as the Louisiana Commission on Human Rights or the "LCHR."

1

desire not to sit in the conventional seat, the SMG employee affirmatively offer the wheelchair user the option to exchange his or her ticket for a ticket for a wheelchair-accessible seat, and

(3) adopt a written policy and train employees on the policy to require that, when an SMG employee informs a wheelchair user that leaving a wheelchair on the Superdome concourse is not permitted, the employee also inform the wheelchair user about the availability of wheelchair check-in and storage at the Guest Relations Center at the Mercedes-Benz Superdome ("Superdome").

On her damages claim, Plaintiff seeks nominal and compensatory damages. Plaintiff also seeks attorney's fees and costs under the ADA[3] and the LHRA.[4]

The matter was tried before the Court, sitting without a jury, on Monday, March 11, 2019.[5] The Court heard testimony from Nancy Smith, Braeden Smith, Brian Brunet, and Laurie Ducros.[6] The Court admitted into evidence Exhibits 1–12 and 15.[7]

Having considered the testimony and evidence at trial, the arguments of counsel, and the applicable law, the Court now issues the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure. To the extent any findings of fact may be construed as conclusions of law, the Court adopts them as such. To the extent any conclusions of law may be construed as findings of fact, the Court adopts them as such.

---

[3] 42 U.S.C. § 12205.
[4] LA. REV. STAT. § 52:2264.
[5] R. Doc. 93 (minute entry).
[6] *Id.*
[7] *Id.*

## FINDINGS OF FACT

The facts found by the Court are largely not in dispute. Plaintiff offered her own testimony and the testimony of her daughter Braeden Smith regarding Plaintiff's experience leading up to and during the Guns N' Roses concert at the Superdome on July 31, 2016. The testimony of Braeden Smith was consistent in all material respects with the testimony of Plaintiff Nancy Smith. Defendants did not offer testimony contradicting the testimony of Plaintiff and her daughter. Defense witnesses Brian Brunet, the SMG Senior Assistant Box Office Manager, and Laurie Ducros, the SMG Guest Services Manager, testified as to SMG's policies regarding the ticket sales, staff training, and accommodations for patrons with disabilities. Plaintiff did not offer testimony contradicting the testimony of the defense witnesses.

Plaintiff Nancy Smith is an amputee who had a complete hip disarticulation of her left leg performed in 2015. Her daughter Braeden Smith bought tickets for herself and her mother via telephone for a Guns N' Roses concert to take place at the Superdome on July 31, 2016. Braeden Smith believed she had called the Superdome Box Office, but she in fact called Box Office Ticket Center LLC. The Box Office Ticket Center LLC customer service representative who sold Braeden Smith the tickets assured her the seats were wheelchair-accessible.

Box Office Ticket Center LLC is a third-party ticket vendor that sells tickets on the secondary ticket market. It purchases tickets from the SMG box office or from Ticketmaster LLC, which is the only authorized third-party vendor for Superdome tickets. Box Office Ticket Center, LLC then resells the tickets at a profit.

On July 31, 2016, Plaintiff Nancy Smith arrived at the Superdome with her daughter Braeden Smith prior to the start of the concert. They entered the Superdome.

Neither Nancy Smith nor Braeden Smith testified as to the gate they used to enter the Superdome. Upon entering the Superdome, they were directed to turn left to take the elevators down to their ground floor seats. Plaintiff and her daughter turned left as directed, but SMG staff denied them access to the three elevators they encountered in that area. SMG staff did not inform Nancy Smith and Braeden Smith as to why they could not use these elevators. Nancy Smith and Braeden Smith eventually were taken to the ground floor, on a freight elevator, by a person who appeared to be a member of the backstage crew.

When Nancy Smith and Braeden Smith reached the ground floor, they spoke to an SMG staffer who guided them to their ticketed seats. They discovered the seats were not wheelchair-accessible. Plaintiff told the staffer she had purchased wheelchair-accessible seats and that she could not sit in the conventional seat for safety reasons. She asked the staffer to remove the existing seat in the space, which was a folding metal chair, to permit Plaintiff to put her wheelchair in the spot. The staffer refused and did not offer Plaintiff the alternative of switching to a wheelchair-accessible seat. Plaintiff believed she had no option but to transfer out of her wheelchair and into the conventional seat if she was going to see the concert. The SMG staffer then took Plaintiff's wheelchair to the left side of the stage and placed it behind a barricade, out of Plaintiff's line of sight.

During the concert, Plaintiff felt anxious, uneasy, and vulnerable because she was not allowed to sit in her wheelchair and because she could not see where it was stored. Plaintiff could not see the band on stage because her view was obstructed by others who were standing. She had been excited about attending the concert, but the experience was ruined for her. After the concert, Plaintiff's wheelchair was returned to her.

Laurie Ducros, the SMG Guest Services Manager, offered testimony about SMG policies. Under SMG policy, when an elevator at a concert leads to a private or restricted area on the ground level, the elevator is restricted. Elevator operators are instructed not to take any patrons to the ground level in restricted elevators. They are instructed to direct patrons to the next available elevator.

The elevator policy is confirmed by the SMG ADA pamphlet, introduced as Exhibit 4 at trial. According to a map of the Superdome in the pamphlet, the Superdome has 17 elevators, numbered 1–14, 2A, 7A, and 8A. Thirteen of these elevators are accessible to patrons with disabilities. The only elevators not accessible to patrons with disabilities are Elevators 5, 10, 13, and 14, which are labeled on the map as "freight only." Elevators 3, 4, 2A, 7A, and 8A do not service the ground level. This information is confirmed by a printout from the Superdome website, which was introduced as Exhibit 7 at trial.

Superdome staff members are trained annually, prior to the beginning of the New Orleans Saints football season. A portion of the training is devoted to accessibility for disabled patrons and the requirements of the ADA. Staff members hired during the year are required to attend a new hire orientation with similar information on SMG's ADA policies. Portions of the PowerPoint presentations SMG uses at these training sessions for new hires were introduced at trial as Exhibits 4 and 5.

It is SMG's usual practice and policy to reserve or "hold back" from sale a certain number of ADA-compliant wheelchair-accessible seats in various areas of the Superdome for use in case a disabled patron requests to be relocated on the day of a concert. If a patron requests to transfer from a conventional seat to an accessible seat, the patron is directed to the Guest Services Desk or Guest Relations Center, where the ticket may be exchanged. The policy regarding holding back seats is posted on the Superdome website,

a printout of which was introduced at trial as Exhibit 7. For the Guns N' Roses concert, SMG sold approximately sixty (60) accessible seats and reserved or "held back" approximately one hundred and fifty (150) accessible seats.

Under SMG's ticket transfer policy, SMG staff members do not affirmatively offer wheelchair users the relocation option because SMG does not wish to assume wheelchair users who purchase tickets for conventional seats cannot use those seats. SMG staff only offer the option when a wheelchair user informs an SMG staff member he or she cannot get out of the wheelchair, cannot sit in the conventional chair, or would be uncomfortable sitting in the conventional chair.[8]

SMG's policy with respect to wheelchair storage is that, when a staff member sees a wheelchair user leaving a wheelchair on the Superdome concourse or in an aisle, the staff member approaches the wheelchair user and informs the patron that the wheelchair cannot be left on the concourse or in the aisle. The staff member then offers the patron two options: either (1) to check the wheelchair at the Guest Relations Center at Gate A and be wheeled to the conventional seat by SMG staff in an SMG wheelchair or (2) to have a companion wheel the patron to his or her seat and then check the wheelchair at the Guest Relations Center. SMG staff are trained to store the wheelchairs only at the Guest Relations Center. The Superdome website states wheelchairs are available for checkout at the Guest Relations Center at Gate A.[9]

---

[8] At trial, Ducros testified the policies are codified in the Team Member Playbook." The Team Member Playbook was not provided to the Plaintiff in the course of discovery and was not admitted as an exhibit at trial. As a result, the Court does not consider it.
[9] Ex. 7.

## CONCLUSIONS OF LAW

### I.    Title II

Plaintiff brings a claim against Defendant Kyle France, in his official capacity as Chairman of the Board of Commissioners of the LSED, for injunctive relief under Title II of the ADA. Because France is sued in his official capacity as Chairman of the Board of Commissioners of the LSED, the claim for injunctive relief against him is, in effect, a claim for injunctive relief against the LSED.[10]

Title II prohibits discrimination by public entities, including the LSED.[11] Title II provides, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."[12] Title II authorizes monetary and injunctive relief.[13] The Fifth Circuit has listed the elements of a claim under Title II as follows:

> To succeed on a claim under Title II of the ADA, a plaintiff must prove: '(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability.'[14]

---

[10] *See Kentucky v. Graham*, 473 U.S. 159, 166–67 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is *not* a suit against the official personally, for the real party in interest is the entity.") (emphasis in original).

[11] Title II defines "public entity" as "any State or local government [or] any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(A), (B).

[12] 42 U.S.C. § 12132.

[13] 42 U.S.C. § 12133 (incorporating remedies laid out in the Rehabilitation Act, which authorizes monetary and injunctive relief).

[14] *Wells v. Thaler*, 460 F. App'x 303 (5th Cir. 2012) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011)). "To recover monetary damages, a plaintiff must prove that the discrimination was intentional." *Id.* (citing *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir.2002)). Because Plaintiff does not bring a claim for monetary damages, she need not prove intentional discrimination.

A.     First Element

The ADA defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual."[15] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."[16] Title II defines as "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."[17] Plaintiff is a qualified individual with a disability for purposes of Title II.

B.     Second Element

To establish the second element of her Title II claim, Plaintiff must show she was "denied the benefits of services, programs, or activities" for which the LSED is responsible, or was "otherwise discriminated against" by the LSED.[18]

The LSED is a public entity subject to the requirements of Title II.[19] Although SMG is responsible by contract for managing the Superdome, the LSED owns the Superdome. The regulations implementing the ADA provide Title II "applies to all services, programs,

---

[15] 42 U.S.C. § 12102(1)(A).
[16] *Id.* at § 12102(2)(A).
[17] *Id.* at § 12131(2).
[18] *Wells v. Thaler*, 460 F. App'x 303 (5th Cir. 2012) (quoting *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011)). "To recover monetary damages, a plaintiff must prove that the discrimination was intentional." *Id.* (citing *Delano–Pyle v. Victoria Cnty.*, 302 F.3d 567, 574 (5th Cir.2002)). Because Plaintiff does not bring a claim for monetary damages, she need not prove intentional discrimination.
[19] Title II defines a "public entity" as "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

and activities provided or made available by public entities."[20] The guidance interpreting this section clarifies that "[a]ll governmental activities of public entities are covered, even if they are carried out by contractors."[21] As a result, although SMG was responsible for operations at the Guns N' Roses concert at the Superdome, the concert is an activity for which the LSED is responsible.

In determining whether conduct by the LSED as a public entity constitutes a denial of benefits of services, programs, or activities or otherwise discriminates, the Court must consult regulations promulgated by the Attorney General.[22] In passing the ADA, "Congress instructed the Attorney General to issue regulations implementing provisions of Title II, including § 12132's discrimination proscription."[23] As the Supreme Court has explained,

> Because the Department [of Justice] is the agency directed by Congress to issue regulations implementing Title II, its views warrant respect. We need not inquire whether the degree of deference described in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,[24] is in order; it is enough to observe that the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance.[25]

Plaintiff is a wheelchair user who was not offered the option to transfer to a wheelchair-accessible seat. The subpart of the Title II regulations entitled "General Requirements" includes specific requirements for ticketing, including requirements for individuals with disabilities who purchase tickets for non-wheelchair-accessible seats on

---

[20] 28 C.F.R. § 35.102(a).
[21] 28 C.F.R. pt. 35, app. B.
[22] *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 592 (1999).
[23] *Id.* at 591.
[24] 467 U.S. 837, 844 (1984); *see also Wells*, 460 F. App'x 303 at 312.
[25] *Olmstead*, 527 U.S. at 597–98 (internal brackets, quotations, and citations omitted).

the secondary ticket market.[26] The Court will address whether the LSED denied her the benefits of the Guns 'N Roses concert or otherwise discriminated against her by (1) violating the regulatory provision regarding tickets sold on the secondary ticket market or (2) deprived her of ready access to the Guns 'N Roses concert.[27]

### 1. Regulatory Provision About Secondary Ticket Market

28 C.F.R. § 35.130(b)(7)(i) provides:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

The regulations implementing Title II include a specific provision with respect to providing access to wheelchair users who purchase tickets for non-wheelchair-accessible seats on the secondary ticket market. 28 C.F.R. § 35.138(g)(2) provides:

> If an individual with a disability acquires a ticket or series of tickets to an inaccessible seat through the secondary market, a public entity shall make reasonable modifications to its policies, practices, or procedures to allow the individual to exchange his ticket for one to an accessible seat in a comparable location if accessible seating is vacant at the time the individual presents the ticket to the public entity.

This regulation was promulgated in 2010.[28] The guidance to the 2010 revisions to the regulations implementing Title II explains:

> As long as there are vacant wheelchair spaces, requiring venues to provide wheelchair spaces for patrons who acquired inaccessible seats and need wheelchair spaces is an example of a reasonable modification of a policy under title II of the ADA. . . . Covered entities are not required to seat every person who acquires a ticket for inaccessible seating but needs accessible seating, and are not required to move any individual who acquires a ticket

---

[26] In her Amended Complaint, Plaintiff does not allege a violation of this specific provision, but she alleges the violation of nearly identical provisions in the regulations implementing Title III. R. Doc. 5 at 8, ¶ 38; 9, ¶ 40.

[27] In her Amended Complaint, Plaintiff enumerates various regulatory provisions she alleges were violated. *Id.* at 11, ¶ 52.

[28] 75 Fed. Reg. 56,180 (Sept. 15, 2010).

for accessible seating but does not need it. Covered entities that allow patrons to buy and sell tickets on the secondary market must make reasonable modifications to their policies to allow persons with disabilities to participate in secondary ticket transfers. The Department believes that there is no one-size-fits-all rule that will suit all assembly areas. In those circumstances where a venue has accessible seating vacant at the time an individual with a disability who needs accessible seating presents his ticket for inaccessible seating at the box office, the venue must allow the individual to exchange his ticket for an accessible seat in a comparable location if such an accessible seat is vacant. Where, however, a venue has sold all of its accessible seating, the venue has no obligation to provide accessible seating to the person with a disability who purchased an inaccessible seat on the secondary market. Venues may encourage individuals with disabilities who hold tickets for inaccessible seating to contact the box office before the event to notify them of their need for accessible seating, even though they may not require ticketholders to provide such notice.[29]

The guidance explicitly adopts the holding of *Independent Living Resources v. Oregon Arena Corp.*,[30] the only federal court decision to address this issue. In *Independent Living*, a Title III case, the court addressed in detail the method by which wheelchair users were offered accessible seats. The court found:

On at least several occasions, wheelchair users who attempted to purchase tickets for an event were told that no wheelchair tickets were available, even though ambulatory patrons were able to purchase tickets for the same event. On other occasions, wheelchair users were "steered" to distant corners of the arena (such as Level 7) while ambulatory friends were able to purchase good tickets for the same event.[31]

Following a bench trial, the court in *Independent Living* found the ticket sale policy "effectively preclude[d] wheelchair users from obtaining the same benefits available to ambulatory patrons" by precluding them from "accepting a gift ticket, going to the game with a friend who has an extra ticket, sharing a season ticket, purchasing a ticket for an individual game from a season ticket holder, and similar options each of which is available

---

[29] 28 C.F.R. pt. 35, app. A.
[30] 1 F. Supp. 2d 1159, 1171 (D. Or. 1998).
[31] *Id.* at 1169.

to ambulatory patrons."[32] The court stated that defendants "may not be active participants in this secondary market, but that does not mean they can simply ignore its existence," particularly when it has "helped to create and to perpetuate this state of affairs by the manner in which they have chosen to sell tickets."[33] The court ordered the following injunctive relief:

> [W]heelchair users must have the same opportunity as other patrons to use tickets acquired through the secondary market (*e.g.,* going to the game with a friend who has an extra ticket, using a complimentary ticket obtained from an employer or family member, sharing a season ticket, purchasing a ticket through the classifieds, *etc.*). Accordingly, although wheelchair users are strongly encouraged to purchase tickets for wheelchair spaces when available, if an individual needing a wheelchair space arrives at a game or other event with a ticket for a conventional seat, *that individual must be seated in an equivalent or better wheelchair space.*[34]

In the instant case, Plaintiff bought her ticket from Box Office Ticket Center LLC on the secondary ticket market. Plaintiff told the SMG staffer she had purchased a ticket for a wheelchair-accessible seat and that she did not want to sit in the conventional seat for safety reasons. She asked the staffer to remove the existing seat in the space, which was a folding metal chair, to permit Plaintiff to put her wheelchair in the spot. The staffer refused, but did not offer Plaintiff the alternative of moving to a wheelchair-accessible seat. Title II regulations explicitly state that transferring patrons with disabilities to wheelchair-accessible seating is a reasonable modification. Although the guidance accompanying the regulation states "there is no one-size-fits-all rule that will suit all assembly areas," it also states a venue "*must* allow the individual to exchange [her] ticket for an accessible seat in a comparable location if such an accessible seat is vacant."[35] In

---

[32] *Id.* at 1170.
[33] *Id.*
[34] *Id.* at 1171.
[35] 28 C.F.R. pt. 35, app. A. (emphasis added).

this case, Plaintiff was not given the option of exchanging her ticket for an accessible seat. SMG failed to make the reasonable modifications to its policies, practices, or procedures required by the Title II regulations.

Unlike in *Independent Living*, in which it was clear the defendant failed to modify its policies, the Court is unable to ascertain whether the SMG staffer's actions were a result of SMG's failure to modify its policies or the staffer's lack of training on existing policies. Title II regulations require reasonable modifications not only to policies, but also to procedures and practices. Regardless of whether the staffer's actions were a result of the absence of a clear policy or to a failure to train staff members on a policy, SMG failed to modify its policies, practices, and procedures to allow Plaintiff to exchange her ticket, in violation of 28 C.F.R. § 35.138(g)(2). The LSED is responsible for SMG's failure. Plaintiff has established the second element of her Title II claim by showing that the LSED denied her the benefits of an activity for which it was responsible by violating 28 C.F.R. § 35.138(g)(2).

### 2. *Program Accessibility*

As another basis for the second element of Plaintiff's Title II claim, Plaintiff argues the LSED discriminated against her because the Guns N' Roses concert was not readily accessible to her. 28 C.F.R. § 35.150(a) provides:

> A public entity shall operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities.

Failure to operate a program so that it is readily accessible to individuals with disabilities constitutes discrimination.

In *Greer v. Richardson Independent School District*, the plaintiff could not access the bleachers at a high school football game because they were not wheelchair-

accessible.[36] She watched the game in an accessible paved area adjacent to the bleachers.[37] The Fifth Circuit explained that "the regulations do not provide any objective criteria for evaluating program accessibility. . . . [P]rogram accessibility is ultimately a *subjective determination* [made] by viewing the program or activity at issue *in its entirety* and not solely by evaluating individual elements of the facility where the program is held."[38] The court found that, even though the bleachers were not accessible to wheelchairs, the school district provided program accessibility to wheelchair users because the school district provided accommodations that allowed wheelchair users to enjoy football games.[39] The court found significant the fact the plaintiff did not seek accommodations, stating, "There is a common sense aspect to determining whether a public entity has provided accommodations for a disabled individual, part of which requires the public entity be made aware of the inadequacy of the accommodations provided."[40] The court held, "when a disabled individual such as Greer attends one event at a venue she was otherwise unfamiliar with, that person does not by default gain a prima facie case of discrimination under Title II merely because she is dissatisfied with her seating location and makes no effort to ask the venue's staff as to where alternative accessible seating is located or if she and her family can be accommodated."[41]

In this case, Plaintiff told an SMG staffer that she had intended to purchase a wheelchair-accessible seat and thought she had done so, because she did not want to sit in a conventional seat for safety reasons. Although she did not specifically request a

---

[36] 472 F. App'x 287, 288 (5th Cir. 2012) (unpublished).
[37] *Id.*
[38] *Id.* at 291–92 (emphasis added).
[39] *Id.* at 295.
[40] *Id.* at 296.
[41] *Id.*

transfer to an accessible seat, she did request the accommodation of removing the conventional seat and putting her wheelchair in its place. Although her requested accommodation could not be granted, the SMG staffer could have otherwise accommodated her disability by offering her the option to transfer to an accessible seat. Instead, she required that Plaintiff sit in the conventional seat and took her wheelchair away from her. Unlike the plaintiff in *Greer*, Smith *did* interact with a staffer and request an accommodation. She also expressed her concern about the SMG staffer's taking away her wheelchair. Unlike in *Greer*, in which the plaintiff was still able to watch the football game, Smith's view was obstructed by standing patrons during most of the concert, and she was unable to enjoy the concert because of her anxiety about her personal safety and about the security of her wheelchair. As a result, the Court finds, when the activity is viewed in its entirety, the Guns N' Roses concert was not readily accessible to Plaintiff. As another basis for the second element of her Title II claim, Plaintiff has shown SMG denied her ready access to the Guns N' Roses concert.

Plaintiff also argues she was denied ready access to the Superdome elevators, which contributed to her inability to access the concert. The Court does not agree. Plaintiff testified she was denied access to three elevators, but she ultimately was taken down to the ground floor in a freight elevator by a crew member. No lack of access to elevators prevented her from accessing the Guns 'N Roses concert.

Ducros testified that SMG restricts access to some elevators during concerts because the elevators lead to areas on the ground level that are not accessible to the public. She speculated that the elevators to which Plaintiff was denied access may have been restricted. No party introduced evidence on the record or elicited testimony about which elevators Plaintiff attempted to use and whether the public was denied access to these

elevators. According to the SMG ADA pamphlet and the Superdome website,[42] four of the Superdome's 17 elevators are freight only, and another five do not service the ground level. Eight of the Superdome's 17 elevators service the ground level and may be used by wheelchair users. Based on the testimony at trial, it is unclear whether Plaintiff was not allowed to use the elevators because of her disability, because the elevators themselves were restricted to freight only, because the elevators were off-limits entirely to the public, or because the elevators did not service the ground level.

C.     Third Element

In determining whether discrimination is by reason of disability, a plaintiff must provide "proof that 'the disability and its consequential limitations were known by the entity providing public services.'"[43] In *Windham v. Harris Cty., Texas*, the Fifth Circuit explained this requirement as follows:

> Mere knowledge of the disability is not enough; the service provider must also have understood the limitations the plaintiff experienced *as a result* of that disability. Otherwise, it would be impossible for the provider to ascertain whether an accommodation is needed at all, much less identify an accommodation that would be reasonable under the circumstances. Thus, because the ADA does not require clairvoyance, the burden falls on the plaintiff to specifically identify the disability and resulting limitations, and to request an accommodation in direct and specific terms. When a plaintiff fails to request an accommodation in this manner, he can prevail only by showing that the disability, resulting limitation, and necessary reasonable accommodation were open, obvious, and apparent to the entity's relevant agents.[44]

In this case, Plaintiff requested an accommodation and made clear she was concerned about sitting in a conventional seat without her wheelchair. Furthermore, the Court finds it was open, obvious, and apparent Plaintiff was an amputee whose mobility

---

[42] Exs. 4, 7.

[43] *Windham v. Harris Cty., Texas*, 875 F.3d 229, 236 (5th Cir. 2017) (quoting *Jin Choi v. Univ. of Tex. Health Sci. Ctr. at San Antonio*, 633 F. App'x 214, 215 (5th Cir. 2015)) (internal brackets omitted).

[44] *Id.* at 236–37 (internal quotations, ellipsis, and citations omitted) (emphasis in original).

was limited and that it would be difficult for her to use a conventional concert seat and needed an accommodation. As a result, Plaintiff has established the third element of her Title II claim.

Plaintiff has established the elements of her Title II claim that the LSED, through its contractor SMG, discriminated against her. Plaintiff was a qualified individual with a disability. Plaintiff was denied the benefits of the Guns 'N Roses concert and discriminated against because the SMG did not make reasonable modifications to its ticketing policies, procedures, and practices and the concert was not readily accessible to her. The discrimination was by reason of disability, as Plaintiff's disability and its resulting limitations were open, obvious, and apparent.

The defendant in a Title II case "may assert an affirmative defense by showing that the requested actions would constitute an undue financial or administrative burden."[45] Defendants have presented no evidence that it would fundamentally alter the nature of the program or constitute an undue burden to modify its policies to allow individuals with disabilities who purchase tickets on the secondary market who object to sitting in conventional seats have the opportunity to transfer to an accessible seat or to make activities at the Superdome readily accessible to people with disabilities. Because Plaintiff has established the elements of her claim, and Defendants have not asserted an affirmative defense, Plaintiff has established a Title II violation against France in his official capacity as Chairman of the Board of Commissioners of the LSED.

---

[45] *Greer*, 472 F. App'x at 292 (citing 28 C.F.R. § 35.150(a)(3)).

## II.    Title III

Plaintiff brings a claim for injunctive relief against SMG under Title III. Title III provides, "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."[46] The statute specifies that it is discriminatory to afford people with disabilities "the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals."[47] It also states discrimination may include:

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.[48]

To establish a Title III violation, a plaintiff must show "(1) she has a disability; (2) Defendant owned, leased, or operated a place of public accommodation; and (3) Defendant denied Plaintiff full and equal enjoyment on the basis of her disability."[49]

Plaintiff is a qualified individual with a disability for purposes of the ADA. SMG is a private entity that operates the Superdome, which is a place of public accommodation. As a result, the first two elements are satisfied. The Court turns to whether SMG denied Plaintiff full and equal enjoyment of the concert on the basis of her disability.

---

[46] 42 U.S.C. § 12182(a).

[47] *Id.* at § 12182(b)(1)(A)(ii).

[48] *Id.* at § 12181(b)(2)(A)(ii).

[49] *Doe v. Ortho-La Holdings, LLC*, No. CV 17-8948, 2018 WL 4613946, at *2 (E.D. La. Sept. 26, 2018) (Milazzo, J.); *see also Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006); *Burrell v. Akinola*, No. 3:15-CV-3568-B, 2016 WL 3523781, at *2 (N.D. Tex. June 27, 2016); *Deutsh v. Wehbe*, No. 1-15-CV-702 RP, 2015 WL 6830920, at *1 (W.D. Tex. Nov. 6, 2015); *United States v. Morvant*, 898 F. Supp. 1157, 1161 (E.D. La. 1995).

The regulations implementing Title III provide:

A public accommodation shall not afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements, with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals.[50]

This language parallels the language of 28 C.F.R. § 35.130(b)(1)(ii), in the regulations implementing Title II. In light of the similarities among the regulations implementing the Titles of the ADA, the Fifth Circuit has stated it finds "no basis for distinguishing their respective burdens of proof."[51]

The Court applies the same burden of proof as under Title II. Like the regulations implementing Title II, the regulations implementing Title III include the following provision pertaining to seats sold on the secondary ticket market:

(i) A public accommodation shall modify its policies, practices, or procedures to ensure that an individual with a disability may use a ticket acquired in the secondary ticket market under the same terms and conditions as other individuals who hold a ticket acquired in the secondary ticket market for the same event or series of events.

(ii) If an individual with a disability acquires a ticket or series of tickets to an inaccessible seat through the secondary market, a public accommodation shall make reasonable modifications to its policies, practices, or procedures to allow the individual to exchange his ticket for one to an accessible seat in a comparable location if accessible seating is vacant at the time the individual presents the ticket to the public accommodation.[52]

These requirements are substantially identical to the requirements of the Title II regulations. The guidance interpreting this provision also is substantially identical to the guidance interpreting the Title II regulation on tickets sold on the secondary ticket

---

[50] 28 C.F.R. § 36.202(b).
[51] *Gambrinus Co.*, 116 F.3d at 1059.
[52] 28 C.F.R. § 36.302(f)(7).

market.[53] For the same reasons the Court found the SMG staffer's failure affirmatively to offer Plaintiff the option to transfer to an accessible seat violated the Title II regulations, the Court finds the staffer's failure to offer this option also violated the Title III regulations.

As a result, with respect to the third element of Plaintiff's Title III claim, the Court finds Plaintiff was denied the full and equal enjoyment of the Guns N' Roses concert. However, the Court also finds Plaintiff has not shown that any difficulty she experienced accessing elevators contributed to a denial of equal enjoyment of the concert.

Plaintiff has established the elements of her Title III claim. SMG has not raised the affirmative defense of undue hardship.[54] As a result, Plaintiff has established a Title III violation against SMG.

## III. LHRA

Plaintiff brings a claim for damages against SMG under the LHRA.[55] The LHRA makes it "a discriminatory practice for a person to deny an individual the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement," on the grounds of disability.[56] A "discriminatory practice in connection with public accommodations" is defined, in relevant part, as "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference in the treatment of a person" because of disability.[57] Plaintiff has a disability

---

[53] *Compare* 28 C.F.R. pt. 36, app. A *to* 28 C.F.R. pt. 35, app. B.

[54] *See Gambrinus Co.*, 116 F.3d at 1059 (discussing undue hardship defense under Title III).

[55] La. Rev. Stat. § 51:2231, *et seq.* Plaintiff brought the claim against all Defendants, R. Doc. 5 at 16–17, but subsequently moved to dismiss with prejudice her claim as against the LSED and France, R. Doc. 60, *granted* R. Doc. 62. *See* R. Doc. 70 at 1 (listing remaining claims).

[56] La. Rev. Stat. § 51:2247.

[57] *Id.* at § 51:2232(5).

within the meaning of the LHRA.[58] The Superdome is a place of public accommodation under the LHRA.[59] The only remaining issue is whether SMG engaged in a "discriminatory practice in connection with public accommodations" by engaging in "any direct or indirect act or practice of exclusion, distinction, restriction, segregation, limitation, refusal, denial, or any other act or practice of differentiation or preference" because of Plaintiff's disability.[60]

No other court has interpreted the LHRA's definition of "discriminatory practice" in the context of disability discrimination. The LHRA establishes the Louisiana Commission on Human Rights, which has the power to "adopt, promulgate, amend, and rescind rules and regulations to effectuate the purposes and provisions" of the LHRA,[61] but the Commission has not done so. Because of this lack of governing legal authority, the Court must determine the relevant legal standard under the LHRA. The Court notes the LHRA's statement of purpose expresses the following legislative intent:

---

[58] LA. REV. STAT. § 51:2247. The LHRA provides the following definition of disability:

> (3)(a) "Disability" means a physical or mental impairment that substantially limits one or more of the major life activities of the individual, a record of such impairment, or being regarded as having such an impairment. For purposes of all laws which incorporate by reference, apply to, or rely for meaning upon the term disability as defined herein, the terms used in this definition have the following meanings:
> (i) "Physical impairment" means any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory, including speech organs, cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine.
> . . .
> (iii) "Major life activities" includes functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

LA. REV. STAT. § 51:2232(3)(a).
[59] The LHRA defines "place of public accommodation" as "any place, store, or other establishment, either licensed or unlicensed, which supplies goods or services to the general public or which solicits or accepts the patronage or trade of the general public, or which is supported directly or indirectly by government funds." LA. REV. STAT. § 51:2232(9).
[60] *Id.* at § 51:2232(5).
[61] LA. REV. STAT. § 51:2235.

> [T]o provide for execution within Louisiana of the policies embodied in the Federal Civil Rights Act of 1964, 1968, and 1972 and the Age Discrimination in Employment Act of 1967; . . . ; to safeguard all individuals within the state from discrimination because of . . . disability . . . in connection with employment and in connection with public accommodations; [and] to protect their interest in personal dignity and freedom from humiliation.[62]

The Louisiana Legislature passed the LHRA in 1988.[63] As originally enacted, the Act did not prohibit discrimination on the basis of disability.[64] Congress enacted the ADA in 1990.[65] In 1993, the Louisiana Legislature amended the LHRA to cover disability discrimination, but did not change the LHRA's statement of purpose to state it provided for the execution of the policies embodied in the ADA, as well as the Civil Rights Act of 1964, 1968, and 1972 and the Age Discrimination in Employment Act.[66]

The Fifth Circuit has noted the LHRA is "substantively similar to Title II of the Civil Rights Act of 1964, 42 U.S.C. § 2000a(a)."[67] The LHRA guarantees "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of a place of public accommodation, resort, or amusement."[68] Title II of the Civil Rights Act of 1964 similarly guarantees "the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin."[69] Title III of the ADA, which prohibits discrimination by public accommodations operated by private entities like SMG, also guarantees "the full and equal enjoyment of the goods, services, facilities, privileges,

---

[62] LA. REV. STAT. at § 51:2231(A).
[63] Act No. 886, 1988 La. Acts 2240 (1988) (codified as amended at LA. REV. STAT. § 51:2231 *et seq.*).
[64] LA. REV. STAT. § 51:2247 (1988) (amended 1993).
[65] Pub. L. No. 101-336, 104 Stat. 327 (codified as amended at 42 U.S.C. § 12101 *et seq.*).
[66] Act No. 820, 1993 La. Acts 2143 (1993).
[67] *Semien v. Pizza Hut of Am., Inc.*, 204 F.3d 1115 (5th Cir. 1999).
[68] LA. REV. STAT. § 51:2247.
[69] 42 U.S.C. § 2000a(a).

advantages, or accommodations of any place of public accommodation" without discrimination on the basis of disability.[70]

Based on the similarities between the LHRA and federal antidiscrimination statutes and the Louisiana legislature's explicit reference to federal antidiscrimination law in the LHRA's statement of purpose, the Court holds the LHRA incorporates the definition of disability discrimination found in Title III of the ADA.[71] The Court applies the ADA definition to Plaintiff's LHRA claim against SMG. For the same reasons that the Court found SMG denied Plaintiff the full and equal enjoyment of the Guns N' Roses concert under Title III, the Court finds SMG denied Plaintiff the full and equal enjoyment of the Guns N' Roses concert, in violation of the LHRA.

## IV. Relief

### A. Damages

Plaintiff seeks nominal damages and compensatory damages for emotional distress against SMG under the LHRA.

LA. REV. STAT. § 51:2264, governing remedies under the LHRA, provides:

Any person deeming himself injured by any alleged violation of the provisions of this Chapter shall have a civil cause of action in district court to enjoin further violations and to recover the actual damages sustained by him, together with the costs of court and a reasonable fee for his attorney of record, all of which shall be in addition to any other remedies contained in this Chapter.

---

[70] 42 U.S.C. § 12182(a).

[71] When the Louisiana Supreme Court has not addressed an issue of state law interpretation, the Court must "make an *Erie* guess and determine . . . how that court would resolve the issue if presented with the same case." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (citing *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir.2003)). When making this guess, the Court "employ[s] Louisiana's civilian methodology, whereby [it] first examine[s] primary sources of law: the constitution, codes, and statutes." *Id.* The Court is confident the Louisiana Supreme Court would also reach the conclusion the LHRA incorporates the ADA's definition of discrimination.

Although Plaintiff is not able to recover damages from SMG under Title III, she may recover from SMG under the statutory text of the LHRA.

At trial, Plaintiff testified she felt anxiety during the concert. She felt trapped and helpless because she was concerned about what would happen if there were an emergency. She had been looking forward to the concert, but she was unable to enjoy it because of the distress she experienced. The testimony of Braeden Smith corroborates and buttresses Plaintiff's testimony. The Court awards Plaintiff $20,000 in compensatory damages for emotional distress. Because the Court awards compensatory damages, it need not award nominal damages.

B.    Injunctive Relief

Plaintiff seeks injunctive relief under Title II of the ADA against France, in his official capacity as Chairman of the Board of Commissioners of the LSED, and under Title III of the ADA against SMG. Plaintiff seeks an injunction requiring Defendants to do the following:

(1) train SMG staff members on SMG's policy that gives priority for elevator use to patrons with disabilities over other patrons and SMG employees,

(2) adopt a written policy and train employees on the policy requiring that, when a wheelchair user with a ticket for a conventional seat objects to or indicates a desire not to sit in the conventional seat, the SMG employee affirmatively offer the wheelchair user the option to exchange his or her ticket for a ticket for a wheelchair-accessible seat, and

(3) adopt a written policy and train employees on the policy requiring that, when an SMG employee informs a wheelchair user that leaving a wheelchair on the Superdome concourse is not permitted, the employee also inform the

wheelchair user about the availability of wheelchair check-in and storage at the Guest Relations Center at the Mercedes-Benz Superdome ("Superdome").

Title II incorporates by reference the remedies of the Rehabilitation Act, which authorizes injunctive relief.[72] Title III incorporates by reference the remedies of the Civil Rights Act of 1964, which also authorizes injunctive relief.[73]

The Supreme Court has established the following requirements for plaintiffs seeking permanent injunctions in general:

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[74]

The Supreme Court has explained the balancing tests and the flexibility granted to the district courts in determining whether to grant an injunction:

> In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction. . . . The grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law.[75]

The Fifth Circuit has not addressed the standard for determining entitlement to injunctive relief under the ADA. Other circuits have found that the traditional equitable considerations listed above apply.[76] Under this test, Smith must show (1) she suffered an

---

[72] 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).
[73] 42 U.S.C. § 12188(a)(1) (incorporating by reference 42 U.S.C. § 2000a-3(a)).
[74] *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).
[75] *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312–13 (1982).
[76] *See, e.g., C.B. v. Bd. of Sch. Comm'rs of Mobile Co., AL*, 261 F. App'x 192, 194 (11th Cir. 2008) ("[U]nless a statute clearly mandates injunctive relief for a particular set of circumstances, the courts are to employ traditional equitable considerations (including irreparable harm) in deciding whether to grant such relief.") (quoting *Bedrossian v. Northwestern Mem. Hosp.*, 409 F.3d 840, 843 (7th Cir.2005)); *Midgett v. Tri-Cty.*

irreparable injury in violation of Titles II and III; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

The Court finds the cases from the other circuits persuasive and adopts this test. As set forth below, the Court analyzes the Title II and Title III violations jointly for the first three factors and finds the factors weigh in favor of injunctive relief. As for the fourth factor, the Court analyzes the Title II claim against France in his official capacity separately from the Title III claim against SMG because injunctions against state entities implicate concerns of federalism and comity.

With respect to the first factor, the Court has found Smith has shown violations of Titles II and III. Specifically, the Court has found (1) the SMG staffer's failure to offer Plaintiff the option to transfer to a wheelchair-accessible seat reflects SMG's failure to modify policies, practices, and procedures to accommodate individuals who purchase non-accessible seats on the secondary ticket market, in violation of Titles II and III, and (2) the SMG staffer's failure to offer Plaintiff a transfer and depriving her of her wheelchair denied Plaintiff equal access to and enjoyment of the program, in violation of Titles II and III.

"[F]or an injunction to issue based on a past violation, [a plaintiff] must establish that there is 'a real or immediate threat that [s]he will be wronged again.'"[77] In its order

---

*Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850 (9th Cir. 2001) ("In order to be entitled to an injunction [under Title II], Plaintiff must make a showing that he faces a real or immediate threat of substantial or irreparable injury.").

[77] *Hainze v. Richards*, 207 F.3d 795, 802 (5th Cir. 2000) (quoting *Plumley v. Landmark Chevrolet, Inc.*, 122 F.3d 308, 312 (5th Cir.1997)).

on the parties' cross-motions for summary judgment with respect to whether Plaintiff had standing to seek injunctive relief under Titles II and III of the ADA, the Court found Plaintiff had standing to seek injunctive relief because she has demonstrated both that she had been deterred from attending concerts because of her experience and that she still intended to return to the Superdome in the future.[78] For the reasons stated in that order, the Court finds Plaintiff has demonstrated a real threat she will be wronged again, and she has established an irreparable injury.

With respect to the second factor, whether the injury may be compensated by other remedies at law, the Court has awarded monetary damages under the LHRA to compensate Plaintiff for her past emotional distress. This relief does not address the prospect of future harm to the Plaintiff. Moreover, the Court has not awarded relief for the ADA violations. "[W]hen a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute, but only the advantages and disadvantages of 'employing the extraordinary remedy of injunction,' over the other available methods of enforcement."[79] As a result, the Court finds Plaintiff's injury are not adequately compensated by other remedies at law.

With respect to the third factor, the balance of hardships between Plaintiff and Defendants, the Court finds that any equitable remedies requiring modifications of policies or training programs do not present a significant hardship to Defendants.

With respect to the final factor, the public interest, the Court analyzes Plaintiff's claim against France, in his official capacity as Chairman of the Board of the LSED, separately from her claim against SMG. For injunctive relief against France under Title

---

[78] R. Doc. 87.
[79] *United States v. Oakland Cannabis Buyers' Co-op.*, 532 U.S. 483, 497–98 (2001).

II, in cases in which a plaintiff seeks injunctive relief against a state governmental entity, concerns of federalism and comity weigh against granting injunctive relief.[80] This includes cases "against those in charge of an executive branch of an agency of state or local governments."[81]

However, Title II explicitly authorizes injunctive relief against public entities.[82] Courts have granted permanent injunctive relief against public entities that discriminate on the basis of disability.[83] The Court has found the LSED violated Title II in a case involving access to a place of public accommodation. Although the Court is mindful of the issues of federalism and comity implicated by ordering injunctive relief against LSED, the Court finds such relief is necessary to remedy the irreparable harm Plaintiff suffered.

The Court turns to the analysis of the fourth factor, the public interest, with respect to SMG's Title III violation. Injunctive relief against SMG to remedy its Title III violation, unlike injunctive relief against the LSED, does not implicate concerns of federalism or comity. The Court also orders injunctive relief against Defendant SMG. The parties must meet and confer to attempt to agree on the appropriate injunctive relief.

## C.    Attorney's Fees and Costs

"Under the ADA, a court 'may allow the prevailing party a reasonable attorney's fee, including litigation expenses, and costs.'"[84] "The ADA's fee-shifting provision is

---

[80] *See Rizzo v. Goode*, 423 U.S. 362, 379 (1976).
[81] *Id.* at 380; *see also Casas v. City of El Paso*, 502 F. Supp. 2d 542, 550 (W.D. Tex. 2007) (denying injunctive relief against municipality because of federalism concerns); *Midgett*, 254 F.3d at 850 (same).
[82] 42 U.S.C. § 12133 (incorporating by reference 29 U.S.C. § 794a).
[83] *See, e.g., Chaffin*, 348 F.3d 850; *Indep. Living Resources*, 1 F. Supp. 2d 1159.
[84] *Shelton v. Louisiana State*, 919 F.3d 325, 328 (5th Cir. 2019) (quoting 42 U.S.C. § 12205) (internal ellipsis omitted).

interpreted under the same legal standard as the similar provision in 42 U.S.C. § 1988."[85] The Supreme Court has explained attorney's fees under § 1988 as follows:

> [T]o qualify as a prevailing party, a civil rights plaintiff must obtain at least some relief on the merits of his claim. The plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought or comparable relief through a consent decree or settlement. Whatever relief the plaintiff secures must directly benefit him at the time of the judgment or settlement. . . . In short, a plaintiff "prevails" when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff.[86]

Similarly, the LHRA permits plaintiffs to recover "the costs of court and a reasonable fee for his attorney of record."[87]

Plaintiff is a prevailing party on her Title II claim against France, in his official capacity, and her Title III and LHRA claims against SMG. The Court awards Plaintiff attorneys' fees against SMG and against France, in his official capacity. Plaintiff's counsel must file a motion for determination of the amount of attorneys' fees within 10 days of the issuance of these Findings of Fact and Conclusions of Law.

## CONCLUSION

Based on the above Findings of Fact and Conclusions of Law, the Court finds that Plaintiff Nancy Smith is entitled to recover from Defendant SMG $20,000 in damages for emotional distress. The Court further finds Plaintiff is entitled to injunctive relief, attorneys' fees, and costs against SMG and against Defendant Kyle France, in his official capacity as Chairman of the Board of Commissioners of the Louisiana Stadium and Exposition District. The Court will enter a judgment to that effect by separate order.

---

[85] *Id.* (citing *No Barriers, Inc. v. Brinker Chili's Texas, Inc.*, 262 F.3d 496, 498 (5th Cir. 2001)).
[86] *Farrar v. Hobby*, 506 U.S. 103, 111–12 (1992).
[87] LA. REV. STAT. § 51:2264.

**IT IS ORDERED** that the parties meet and confer to attempt to agree on the appropriate injunctive relief. The parties will file jointly, within 30 days of the issuance of these findings of fact and conclusions of law, a proposed consent judgment addressing how SMG and the Louisiana Stadium and Exposition District will ensure their policies and procedures provide that:

(1) when a wheelchair user with a ticket for a conventional seat objects to or indicates a desire not to sit in the conventional seat, an SMG employee will affirmatively offer the wheelchair user the option to exchange his or her ticket for a ticket for a wheelchair-accessible seat;

(2) when an SMG employee informs a wheelchair user that leaving a wheelchair on the Superdome concourse is not permitted, the employee also will inform the wheelchair user about the availability of wheelchair check-in and storage at the Guest Relations Center at the Mercedes-Benz Superdome; and

(3) SMG employees are adequately trained on these policies.

**IT IS FURTHER ORDERED** that counsel for Plaintiff Nancy Smith file a motion for determination of the amount of attorneys' fees by no later than **Thursday, May 23, 2019 at 5:00 p.m.**

New Orleans, Louisiana, this 14th day of May, 2019.

_____
**SUSIE MORGAN**
**UNITED STATES DISTRICT JUDGE**